THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD ALFARO, Appellant.

Second Department, May 20, 1985

### APPEARANCES OF COUNSEL

*Spiros A. Tsimbinos* for appellant.

*Robert Abrams, Attorney-General (William F. Dowling* and *Richard A. Serafini* of counsel; *Sal Petilos* on the brief), for respondent.

### OPINION OF THE COURT

TITONE, J.

■ Defendant appeals from a judgment of the Supreme Court, Queens County (121 Misc 2d 804), which convicted him, following a nonjury trial, of insurance fraud in the third degree (Penal Law § 176.10) and imposed a $1,000 fine. The facts, as detailed in the dissenting opinion, are plainly sufficient to support the verdict (*People v Malizia,* 62 NY2d 755, 757, *cert denied* __ US

___, 105 S Ct 327; *People v Klein,* 105 AD2d 805, *affd* 65 NY2d 613 for reasons stated in memorandum at App Div), and the only issue which divides us is whether an acquittal on a separate count of attempted petit larceny renders the verdict "repugnant", warranting dismissal of all charges. The majority concludes that the defendant is not entitled to such a windfall and therefore affirms the judgment of conviction.

Preliminarily, we question whether the issue is properly before us as a purported error of law. Generally, a defendant is precluded from raising a claim of repugnancy on appeal absent appropriate protest in the trial court (*People v Satloff,* 56 NY2d 745; *People v Stahl,* 53 NY2d 1048; *People v Howard,* 107 AD2d 712; *People v Holmes,* 104 AD2d 1049).

The dissenters are of the view that no protest could be registered to the Trial Judge's action (*cf. People v Pastore,* 46 AD2d 870) so that no preservation is necessary. It would seem, however, that defendant could have made a motion to set aside the verdict pursuant to CPL 330.30 (*cf. People v Salemmo,* 38 NY2d 357; *but see, People v Pastore, supra*).[*] The real reason for the failure to protest is more basic — the defendant simply did not wish to run the risk that the acquittal would be reconsidered (*cf. People v Salemmo, supra; but see, People v Pastore, supra*). Nevertheless, in light of the sharp division in this court and the language contained in *People v Pastore* (*supra*), we shall address the merits.

In *People v Pugh* (36 AD2d 845, *affd* 29 NY2d 909, *cert denied* 406 US 921), we squarely and unequivocally held that inconsistency of a verdict rendered by a judge after a bench trial would not lead to reversal so long as the inconsistency related to separate counts of the accusatory instrument, precisely the case here (*see also, People v Williams,* 47 AD2d 262, 266 [Christ, J.]). The rule is almost universally followed (*see, United States v West,* 549 F2d 545, *cert denied* 430 US 956; *Haynesworth v United States,* 473 A2d 366 [DC App]; *People v O'Malley,* 108 Ill App 3d 823, 439 NE2d 998; *Commonwealth v Harris,* 239 Pa Super Ct 603, 360 A2d 728, *affd* 488 Pa 141, 411 A2d 494; Ann., 18 ALR3d 259, 286). In fact, a panel of the appellate court of

---

[*] In *People v Salemmo* (38 NY2d 357), the Court of Appeals held that the resubmission of a defective verdict to the jury was not violative of the double jeopardy clause or statutory rights even though the effect was to change a not guilty verdict to a guilty verdict on the resubmitted counts. The same result should obtain in nonjury trials (*cf. People v Carter,* 63 NY2d 530, 538-539; *People ex rel. Imbruglia v Jackson,* 8 AD2d 651, *affd* 9 NY2d 767; *People v Lemmons,* 270 App Div 828; *People v Paulides,* 88 Misc 2d 1061).

Illinois found *People v Pugh (supra)* to be persuasive in reaching an identical result *(People v O'Malley, supra).*

It is true that, at one time, the United States Court of Appeals for the Second Circuit mandated consistency in such circumstances *(United States v Maybury,* 274 F2d 899). That rule, however, was adopted over the disagreement of Judge Learned Hand who protested that exculpating a defendant was an inappropriate method for preventing "errors in judicial dialectic" *(supra,* at p 908 [Hand, J., dissenting in part and concurring in part]) and was expressly rejected by this court in *People v Pugh* (36 AD2d 845, *supra).* Moreover, even the Second Circuit read *United States v Maybury (supra)* narrowly, upholding numerous convictions alleged to be inconsistent *(see, e.g., United States v King,* 373 F2d 813; *United States v Wilson,* 342 F2d 43, 45; *United States v Tankel,* 331 F2d 204; *United States v Sells,* 325 F2d 161, 162; *United States v Robinson,* 320 F2d 880, 881). The one decision since *United States v Maybury (supra)* in which the Second Circuit set aside a conviction due to inconsistent verdicts by a trial judge — ironically, a habeas corpus proceeding involving a New York criminal conviction — was summarily reversed by the Supreme Court *(Rivera v Harris,* 643 F2d 86, *revd* 454 US 339).

Nor are the verdicts impermissibly repugnant in the accepted sense. Such a repugnancy exists where the crimes contain identical elements *(see, People v Tucker,* 55 NY2d 1, 6; *People v Belvin,* 47 AD2d 929; *People v Williams,* 47 AD2d 262, 266-267, *supra).* "The critical concern is that an individual not be convicted for a crime on which the [trier of fact] has actually found that the defendant did not commit an essential element" *(People v Tucker,* 55 NY2d 1, 6, *supra).*

In creating the crime of insurance fraud, the Legislature and the Governor obviously did not believe that it and the crime of larceny contained identical elements *(see,* Insurance Law § 38; Governor's approval memorandum, 1981 McKinney's Session Laws of NY, at 2617-2618) and the statutory language itself shows this to be so. Larceny requires a finding of an "intent to deprive another of property or to appropriate the same" and a wrongful taking, obtaining or withholding of property from its owner (Penal Law § 155.05 [1]). On the other hand, insurance fraud requires a finding that the defendant "knowingly and with intent to defraud presents * * * any written statement as part of, or in support of, an application for the issuance of * * * a claim for payment or other benefit pursuant to an insurance policy" (Penal Law § 176.05).

Thus, it is clear that the elements of the two are completely different and that an acquittal of a larceny charge does not negate an essential element of insurance fraud. While larceny provisions address the wrongful taking of property with the intent to deprive someone of that property, the essence of insurance fraud is the filing of a false written statement as part of a claim for insurance. Consequently, the trier of fact may have concluded that the defendant intended to defraud the insurance company but did not intend to steal property (*see, People v Pisano,* 105 AD2d 1156). Though perhaps illogical, the verdicts may stand (*see, United States v Powell,* 469 US __, 83 L ed 2d 461; *People v Goodfriend,* 64 NY2d 695; *People v Pisano, supra; People v Gross,* 51 AD2d 191, 198; *People v Pugh,* 36 AD2d 845, *supra*).

There is an additional explanation for the verdict: perhaps the Trial Judge may have decided that pyramiding of charges was inappropriate and acted out of a sense of mercy. Such a rough sense of justice is legally improper, but it cannot, of course, be challenged by the People through the appellate process. Like Judge Hand, we do not think that two wrongs equal a right to exculpation on all counts in order to prevent "errors in judicial dialectic" (*United States v Maybury,* 274 F2d 899, 908, *supra* [Hand, J., dissenting in part and concurring in part]; *see, People v Pastore,* 46 AD2d 870, 871, *supra* [Steuer, J., dissenting]). As the Supreme Court put it in *Harris v Rivera* (454 US 339, 348, *supra*), the "Constitution does not prohibit state judges from being excessively lenient".

There is no merit to any of the other arguments. The judgment should be affirmed.

EIBER, J. (dissenting). The primary issue presented by this appeal is whether defendant's conviction for insurance fraud in the third degree (Penal Law § 176.10), rendered after a nonjury trial, is repugnant with his simultaneous acquittal of attempted petit larceny (Penal Law §§ 155.25, 110.00). The majority is of the opinion that the verdicts are not repugnant. Having reviewed the law concerning repugnant and inconsistent verdicts, I conclude, however, that the verdicts are indeed repugnant and, accordingly, vote to reverse the judgment appealed from and to dismiss the indictment.

The charges against defendant Richard Alfaro arise out of a rather ingenious scheme concocted by his codefendant, David G. Hirsch, the purpose of which was to receive double recovery for property damage sustained in a single accident to a Rolls Royce automobile owned by Hirsch. On February 24, 1981, Hirsch,

while driving his Rolls Royce, struck a utility pole owned by the Long Island Lighting Company and caused severe front-end damage to the vehicle. At the time of the accident, Hirsch's vehicle was insured by the Liberty Mutual Insurance Company (hereinafter Liberty Mutual). After the incident, Hirsch filed an accident claim form with Liberty Mutual and a representative of that company was assigned to appraise the damage to the vehicle. On March 16, 1981, the vehicle was inspected and five photographs were taken of the damage. The insurance company inspector concluded that because of the severity of the damage approximately 28 parts had to be replaced and he estimated that the total amount necessary to repair the damage to be approximately $29,000. At the time of this inspection, the odometer on the Rolls Royce registered 22,312 miles. Hirsch eventually received a $25,000 check from Liberty as reimbursement for his claim and an additional $4,000 from the excess insurance carrier.

Sometime after the accident, the Rolls Royce was transported to Alfaro's collision body repair shop in Jackson Heights, Queens County, for repairs. According to Alfaro, he repaired the damaged vehicle to the extent necessary to make it operable without using any new parts, and completed the work in July 1981. Alfaro received $10,000 from Hirsch for his repair work on the vehicle. Neither Alfaro nor Hirsch was able to produce a copy of the repair bill or a certificate of completion for the repairs. At trial, Alfaro explained that he did not issue a certificate of completion in this case because he never reached an agreement with Hirsch's insurer.

On or about May 27, 1981, while the necessary repairs on his Rolls Royce were being performed, Hirsch canceled his automobile insurance policy with Liberty Mutual, even though it was not due to expire until January 21, 1982, and the policy premium had not been increased. Hirsch then applied for a new insurance policy with the Metropolitan Property Insurance Company (hereinafter Metropolitan). In processing Hirsch's application, Metropolitan authorized Carco, an automobile inspection organization, to conduct a visual inspection of Hirsch's automobile. The inspection was performed by Thomas DiBlasi on behalf of Carco at Alfaro's collision repair shop in July 1981. The written report filed by DiBlasi following his alleged inspection indicated that the Rolls Royce was in good physical condition with a mileage reading 22,312 miles. At trial, however, DiBlasi admitted that he never actually saw the Rolls Royce during his July 1981 inspection. Apparently, DiBlasi filled out the Carco inspection form based on photographs of the vehicle as

well as information provided by Alfaro. DiBlasi acknowledged that he departed from normal procedures as well as Carco's requirements when he filed an inspection form without actually viewing the vehicle in question.

On December 8, 1981, Hirsch's Rolls Royce was allegedly involved in a second "accident". According to the evidence presented by defendants, on that date Hirsch was traveling on Northern Boulevard in Queens County when an unidentified vehicle forced him off the roadway and into a concrete stanchion which supported an overhead extension of the Grand Central Parkway. Hirsch's vehicle again sustained extensive front-end damage as well as a broken windshield and some rear-end damage. A police officer who was flagged down by Hirsch after the accident occurred observed the damaged vehicle up against the concrete stanchion. He also noticed that the car was not running when he arrived. A short time later, Hirsch telephoned Alfaro's shop and Alfaro, accompanied by one of his employees, responded to the accident site with a tow truck. The damaged vehicle was later transported to Alfaro's collision shop.

On the date of the second "accident", someone contacted Metropolitan on behalf of Hirsch and made a claim for the collision damage to the Rolls Royce. Thereafter, Hirsch supplied Metropolitan with a written accident report, and an MV 104 report which had been filed by him with the New York State Department of Motor Vehicles. Hirsch also made an oral statement via telephone in support of his claim to a Metropolitan representative.

On December 23, 1981, a Metropolitan field appraiser, John Kelly, was assigned to inspect Hirsch's damaged Rolls Royce at Alfaro's premises. During his inspection, Kelly recorded the vehicle's identification number and took four photographs of the vehicle. According to Kelly, Alfaro read the vehicle's odometer and informed him that the registered mileage was 22,312 miles. Kelly was unable to complete the appraisal because he did not have a price list for Rolls Royce parts. Alfaro agreed to obtain the necessary information and contact Kelly. Kelly twice contacted Alfaro after the inspection for the price list but on both occasions, Alfaro said he had not yet obtained the list. Due to the absence of this information, Kelly never made a final estimate of the damage.

Sometime during December 1981, Ann Colleran, the Metropolitan claims representative assigned to handle Hirsch's claim, became suspicious that the Rolls Royce had been involved in a prior accident. Because of her suspicions, Colleran, unbeknownst

to Hirsch, contacted the State Insurance Department concerning Hirsch's claim. Thereafter, the Frauds Bureau of the Insurance Department instituted an investigation into the claim. During the investigation, the photographs which had been taken by the Liberty inspector after the first accident were compared with those taken by Mr. Kelly on behalf of Metropolitan in December 1981. Following an expert analysis of both sets of photographs, it was determined that the front-end damage portrayed in the photographs was identical. According to the State's expert, it would have been impossible to duplicate the sustained front-end damage to such an extent by two separate collisions.

In 1982, Alfaro and Hirsch were both indicted on charges of insurance fraud in the first degree (Penal Law § 176.20) and attempted grand larceny in the second degree (Penal Law §§ 155.35, 110.00). The indictment essentially alleged that during the period from February 24, 1981 through January 31, 1982, the defendants, while acting in concert with one another committed a fraudulent insurance act and attempted to wrongfully obtain and/or steal property, namely, money, from Metropolitan in excess of $1,500. Alfaro and Hirsch were jointly tried before the court without a jury. Following the trial, the court reserved decision and subsequently rendered its verdict in the form of a memorandum decision in which it concluded, in the first instance, that based on the evidence adduced at trial "there was in fact only one accident and that the alleged second accident was actually staged by defendants Hirsch and Alfaro for the purpose of making a second insurance claim" (121 Misc 2d 804, 808). The court, however, also determined that the People had failed to sustain their burden in proving that Hirsch's written statement filed with Metropolitan was meant to be a claim for payment in excess of $1,500 since there had been no proof as to the specific cost of any repairs. In view of the lack of proof on the monetary value of the insurance claim, the court found both defendants guilty of a reduced charge of insurance fraud in the third degree (Penal Law § 176.10). Hirsch was also found guilty of attempted petit larceny.[1] The court, however, dismissed the attempted grand larceny in the second degree charge against Alfaro stating (p 810), "there was no evidence linking him to the attempted larceny". Alfaro was

---

1. Insurance fraud in the first degree (Penal Law § 176.20) and attempted grand larceny in the second degree (Penal Law § 155.35) contain elements requiring that the pecuniary value of the property involved be in excess of $1,500.

subsequently sentenced to a $1,000 fine upon his conviction of insurance fraud in the third degree.

At the outset, I am constrained to note that, although not urged by the People, following the trial court's rendition of its verdicts, Alfaro did not register any protest to the verdict as to him on the basis of repugnancy and thus, under the dictates of *People v Stahl* (53 NY2d 1048) and its companion cases, which involved repugnant jury verdicts, Alfaro's present challenge to the verdicts on this ground has not "technically" been preserved for appellate review. I am of the opinion, however, that under the circumstances of this case, preservation is unnecessary since even assuming that Alfaro did move to set aside the verdict pursuant to CPL 330.30, the trial court did not have the ability to alter its verdict of acquittal, as such is not a mere "ministerial act" (*see, People v Pastore,* 46 AD2d 870; *see also, People v Carter,* 63 NY2d 530, 538).

In *People v Tucker* (55 NY2d 1), the Court of Appeals set forth the definitive standard of review to be applied in determining whether a jury verdict is repugnant as a matter of law. Therein, the Court of Appeals stated (55 NY2d 1, 7, *supra*) that a claim that a jury verdict is repugnant is to be resolved by reviewing "the jury charge so as to ascertain what essential elements were described by the trial court; then, the assertedly inconsistent verdicts will be harmonized on the basis of the jury charge. Under this approach, a conviction will be reversed only in those instances where acquittal on one crime as charged to the jury is conclusive as to a necessary element of the other crime, as charged, for which the guilty verdict was rendered (see, Wax, 24 NY L School L Rev, at pp 740-742)". Thus, under this test, the court's review of a claim of repugnancy is strictly limited to the confines of a jury charge, regardless of the legal accuracy of the charge or the particular facts of the case (*see, People v Tucker, supra; People v Goodfriend,* 100 AD2d 781, *affd* 64 NY2d 695; *People v Zuziela,* 98 AD2d 161; Lewin, *Criminal Procedure,* in 1982 Survey of NY Law, 34 Syracuse L Rev 173, at 204-206). Of importance to the case at bar, the *Tucker* court made special mention (55 NY2d 1, 6-7, n 3, *supra*) of the fact that: "what is involved in the instant case is only the situation where a *jury* renders inconsistent verdicts. Different considerations may be present when the trier of fact is the *Judge* (see *United States v Maybury,* 274 F2d 899; Comment, 60 Col L Rev, at pp 1006-1007; Wax, 24 NY L School L Rev at p 736, and n 88). As the issue is not now before this court, there is no occasion to consider it".

Having now been presented with that very issue, I conclude that the appropriate test to be applied in reviewing a claim of repugnancy in verdicts rendered by a judge is to compare the necessary statutory elements of the crimes in issue and determine whether the acquittal on one charge is conclusive as to an element which is necessary to and inherent in a charge on which a conviction has occurred. If so, the conviction must be set aside. This test parallels that set forth in *People v Tucker* (*supra*) in that it is based upon the obvious assumption that a judge "charges" himself or herself in his or her role as trier of fact, in accordance with the relevant statutory authority.

On this point, it is significant to note that there is some authority to support the position that a much broader standard of review than that set forth above should apply when reviewing a nonjury verdict on repugnancy grounds. Such a broader standard would permit a review of the entire record in the case to determine whether the judge's verdict was factually as well as legally consistent. For example, in *United States v Maybury* (274 F2d 899) the United States Court of Appeals for the Second Circuit, in a majority opinion authored by Judge Friendly, made the point that the policy consideration behind the judiciary's reluctance to disturb a seemingly inconsistent jury verdict does not apply to a verdict rendered by a judge, such policy consideration being that the jury serves as arbiter of the community whose prerogative it is to reach a compromise verdict in order to serve the interest of the community. Similarly, the requirement of unanimity of a jury verdict creates a need for compromise and the jury should be allowed to protect against the excessive zeal of prosecutors by exercising lenity (*United States v Maybury, supra,* at p 903). Judge Friendly concluded (*United States v Maybury, supra,* at p 903) that: "[N]one of these considerations is fairly applicable to the trial of a criminal case before a judge. There is no 'arbitral' element in such a trial. While the historic position of the jury affords ample ground for tolerating the jury's assumption of the power to insure lenity, the judge is hardly the 'voice of the country', even when he sits in the jury's place * * * We do not believe we would enhance respect for law or for the courts by recognizing for a judge the same right to indulge in 'vagaries' in the disposition of criminal charges that, for historic reasons, has been granted the jury * * * Since we find no experience to justify approval of an inconsistent judgment when a criminal case is tried to a judge, we think logic should prevail". With this premise, the *Maybury* court reversed a conviction on one count of a two-count indictment on the basis that in view of the evidence in the record, an acquittal on the second count was

logically inconsistent with the conviction on the first. In reaching that result, Judge Friendly ruled that the Federal rule enunciated in *Dunn v United States* (284 US 390), which provided that inconsistency in a verdict rendered by a jury does not form a basis for reversal so long as the inconsistency related to separate counts of the accusatory instrument, was inapplicable to cases involving inconsistent nonjury verdicts.

Several recent cases have expressed disagreement with the *Maybury* rationale. For example, in *Harris v Rivera* (454 US 339), the United States Supreme Court, faced with an apparent factually inconsistent bench trial verdicts involving multiple defendants,[2] expressed the view that inconsistent verdicts rendered by a trial judge do not constitute a fatal irregularity in a finding of guilt. While acknowledging that the apparent inconsistency could "constitute evidence of arbitrariness that would undermine confidence in the quality of the judge's conclusion" (*supra,* at p 346), the Supreme Court posited that: "[o]ther explanations for an apparent inconsistency are far more likely. Most apparent is the likelihood that the judge's actual observation of everything that transpired in the courtroom created some doubt about the guilt of one defendant that he might or might not be able to articulate in a convincing manner" (*supra,* at p 347). The Supreme Court also acknowledged the possibility that the inconsistency was a result of an exercise of lenity by the trial judge. While refusing to condone a trial judge's exercise of judgment (as opposed to sentencing) lenity, the court noted that such a practice does not create a constitutional violation, stating "[t]he Constitution does not prohibit state judges from being excessively lenient" (*Harris v Rivera,* 454 US 339, 348, *supra; see also, Haynesworth v United States,* 473 A2d 366 [DC App]; *People v O'Malley,* 108 Ill App 3d 823, 831, 439 NE2d 998, 1002-

---

**2.** *Harris v Rivera* (454 US 339) is not directly on point in that it involved a collateral attack on a final judgment of a State court which was affirmed on appeal (*supra,* at p 343). The asserted inconsistency involved therein was between verdicts rendered against three codefendants. In a nonjury trial, the defendant Rivera, along with a codefendant, was convicted of charges arising out of a robbery. A third defendant was acquitted of identical charges. Rivera argued that the verdicts were inconsistent and that his conviction violated his due process rights accorded by the 14th Amendment. The Second Circuit (643 F2d 86) held that the absence of appropriate findings in support of the factually inconsistent judgments violated the due process clause. The Supreme Court reversed, holding that the Second Circuit erred in requiring a State judge to explain his reasons for acquitting a defendant in a State criminal trial. The court explained: "Federal judges have no general supervisory power over state trial judges; they may not require the observance of any special procedures except when necessary to assure compliance with the dictates of the Federal Constitution" (*supra,* at pp 344-345).

1005; *United States v West,* 549 F2d 545, 553, *cert denied* 430 US 956; *Commonwealth v Harris,* 239 Pa Super Ct 603, 360 A2d 728).

I agree with the latter view insofar as I acknowledge the prerogative of a trial judge, sitting as trier of fact, to render factually inconsistent verdicts, whether such verdicts be a result of an exercise of lenity or due to an unarticulated doubt harbored by the trial judge in regard to the defendant's guilt. In light of this premise, it would accordingly be inappropriate for an appellate court, presented with a claim of repugnant or inconsistent bench trial verdicts, to engage in an analysis and review of the entire record so as to consider all the evidence and determine the underlying rationale of the judge's decision. The Court of Appeals in *People v Tucker* (55 NY2d 1, 7, *supra*), addressing the issue of inconsistent jury verdicts, noted that: "The problems of second-guessing [the jury] are compounded by the possibility that the jury has not necessarily acted irrationally, but instead has exercised mercy * * * When the jury has decided to show lenity to the defendant, an accepted power of the jury * * * the court should not then undermine the jury's role and participation by setting aside the verdict". This reasoning is equally applicable to cases involving inconsistent verdicts rendered by a judge after a nonjury trial. Of course, however, the trial judge's right to exercise lenity, like the jury's, cannot be wielded at the expense of rendering a repugnant verdict; namely, where an acquittal on one charge is conclusive as to an element which is necessary to, and inherent in, a charge on which a conviction has occurred. Such a verdict cannot stand. Thus, it is proposed that by limiting an appellate court's review of a claim of repugnant bench trial verdicts to a comparison and analysis of the relevant statutory elements of the crimes in issue, the aforementioned problems of second-guessing the trier of fact and intruding upon the judge's exercise of lenity would necessarily be avoided while at the same time insuring against the possibility of repugnant nonjury trial verdicts.

Applying this standard of review to the case at bar, I conclude, contrary to the majority, that the rendered verdicts are repugnant. Insurance fraud in the third degree is defined in Penal Law § 176.10 as follows: "A person is guilty of insurance fraud in the third degree when he commits a fraudulent insurance act". The term "fraudulent insurance act" is defined, in relevant part, in Penal Law § 176.05 as follows: "A fraudulent insurance act is committed by any person who, *knowingly and with intent to defraud* presents, causes to be presented, or prepares with knowledge or belief that it will be presented to or by an insurer

or purported insurer, or any agent thereof, any written statement as part of, or in support of * * * a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which he knows to: (i) contain materially false information concerning any fact material thereto; or (ii) conceal, for the purpose of misleading, information concerning any fact material thereto" (emphasis added).

The term "larceny" is defined, in pertinent part, in Penal Law § 155.05:

"1. *A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.*

"2. *Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section,* committed in any of the following ways:

"(a) *By conduct heretofore defined or* known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or *obtaining property by false pretenses*" (emphasis added).

"Petit larceny" is defined in Penal Law § 155.25 as: "A person is guilty of petit larceny when he steals property".

Reviewing the elements of these crimes, there does not appear to be any logical way that a person could engage in insurance fraud by knowingly and with intent to defraud submitting papers in support of a false claim for payment, without at the same time attempting to commit a larceny. That is, when one submits false papers in support of a claim for payment for his own benefit or that of another, he is concomitantly attempting to commit a larceny by wrongfully obtaining property by false pretenses from the insurer. As a result, in preparing or causing to be prepared false papers in support of Hirsch's claim, Alfaro would have been an accessory to Hirsch in the latter's attempt to take or obtain money from Metropolitan and, therefore, guilty of attempted larceny as well as insurance fraud. The People, and the majority, take the position that the element of intent in the crimes of larceny and insurance fraud is completely different; that is, while the larceny provisions address the wrongful taking of property with the intent to deprive someone of that property, the essence of insurance fraud is the knowing and intentional filing of a false written instrument as part of a claim of insurance. While I acknowledge that the statutory definition of a fraudulent insurance act (Penal Law § 176.05) does not specifically state that the purpose of submitting false papers in support

of a claim for payment is to wrongfully take or obtain property from the insurer, that is obviously the intent in any such insurance fraud. Thus, even though the language of the statutes is not the same, the underlying meaning clearly coincides. This conclusion is supported by the legislative history behind the enactment of Penal Law article 176 (L 1981, ch 720). The adoption of that article was proposed by then Governor Carey as part of a series of measures designed to combat insurance fraud. In his memorandum approving Laws of 1981 (ch 720), the Governor stated in relevant part: "The amendments to the Penal Law, particularly the classification of insurance fraud involving pecuniary values in excess of $1,500 as Class D felonies, track the classifications for larcenies and will be an indication by the Legislature that the State will no longer tolerate crime in the insurance field" (Governor's approval memorandum, 1981 NY State Legis Ann, at 384; *see also,* Hechtman, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law §§ 176.15, 176.20, pp 172-173, 1984-1985 Pocket Part).

In this vein, we note that the case of *People v Pisano* (105 AD2d 1156), relied upon by the majority, is distinguishable. Therein, the defendant claimed that his conviction for offering a false instrument for filing in the first degree (Penal Law § 175.35) was invalid since it was inconsistent with, and repugnant to, his acquittal of grand larceny in the second degree (Penal Law § 155.35). The Fourth Department rejected the defendant's contention stating: "Since the two crimes do not have the same elements (see *People v Gross,* 51 AD2d 191, 198) and require a separate and specific intent (see *People v McDavis,* 97 AD2d 302, 304-305), the jury could have found that defendant intended to defraud the State (Penal Law, § 175.35) but did not intend to steal property (Penal Law, § 155.35)" (*People v Pisano,* 105 AD2d 1156, *supra*). Clearly, a distinction exists between these two crimes. A person may have a variety of reasons for offering a false instrument for filing separate and apart from an intent to take or obtain property from another which is necessary for a larceny conviction. However, I question what other possible intent a person could have for filing a false written statement in support of an insurance claim for payment other than an intent to wrongfully take or obtain property from an insurance company for his own or another's benefit.

In conclusion, I acknowledge that the trial court apparently sought to exercise leniency towards Alfaro in rendering these verdicts. While the exercise of mercy is within the prerogative of the trier of fact, this inherent power cannot be utilized at the expense of rendering repugnant verdicts. Moreover, I note that I

am in agreement with the majority insofar as it contends that factually inconsistent verdicts, rendered by a jury or judge, should not be disturbed since such verdicts generally indicate a desire on the part of the trier or triers of fact to exercise lenity towards the defendant.

MOLLEN, P. J., and O'CONNOR, J., concur with TITONE, J.; EIBER, J., dissents and votes to reverse the judgment appealed from, on the law, and to dismiss the indictment, with an opinion, in which LAWRENCE, J., concurs.

Judgment of the Supreme Court, Queens County, rendered December 15, 1983, affirmed.